DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas, Juvenile Division, in a termination of parental rights case. Because we conclude that the trial court properly granted permanent custody of the four children to the children's services agency, we affirm. *Page 2 
 {¶ 2} Appellant, Jere L. ("father") is the biological father of four children, Sierra, Jerica, Jeretha, and Jere, Jr. Jere's wife, appellant, Jennifer L. ("mother"), is the biological mother of Jeretha and Jere.[1] In May 2005, Lucas County Children Services ("LCCS") filed two complaints in dependency and neglect regarding Jerica, Sierra, and Jeretha. The complaint alleged that mother tested positive for cocaine and marijuana, that she reported that she and father had recently used drugs, that there was domestic violence issues, and that the family did not have stable housing.
 {¶ 3} On June 16, 2005, the juvenile court magistrate conducted a hearing as to the complaints. After certain stipulations were placed on the record, by agreement of all the parties, the court found all three children to be neglected as to father. Father also stipulated to a disposition of temporary custody to LCCS.
 {¶ 4} Since mother was incarcerated at the time of the hearing, the court separately heard testimony and made findings regarding the allegations against mother as to Jeretha. An LCCS caseworker testified that the case was opened due to concerns regarding domestic violence, drug abuse, physical abuse, and the lack of basic needs. Prior to the filing of the complaint, LCCS offered "safety plan" services including domestic violence treatment for father, domestic violence victim group for mother, drug treatment for both parents, diagnostic assessments, and stabilization of housing. *Page 3 
 {¶ 5} In March and April 2005, mother tested positive for both crack and marijuana. At that time, although mother said she was separating from father because of physical abuse and other problems, she always returned to the relationship. Mother also denied using crack, and alleged that father used and was providing her with crack. The caseworker stated that providing services to and staying in contact with the parents was difficult because the family moved every month. The agency also had concerns that the children were being left with inappropriate caregivers, including Sierra's and Jerica's biological mother who reportedly used crack, lived in a known "drug house," and from whom the children had been legally removed by LCCS.
 {¶ 6} Based upon the testimony presented, the court found Jeretha to be a neglected child as to mother. Testimony was then presented as to disposition. The caseworker stated that a case plan had been prepared as part of the safety plan, but mother either had not attempted or had not been able to follow through with any of the programs due to her incarceration. Mother was to be soon released from jail in July 2005. The court then granted temporary custody of Jeretha to LCCS and approved the case plan which outlined services for the parents with reunification as the goal.
 {¶ 7} In December 2005, the court again approved a case plan, hearing testimony that mother was still incarcerated, until February or March 2006, and that father had completed the assessment parts of his case plan, but was not in compliance with parts recommending domestic violence treatment and other services. *Page 4 
 {¶ 8} In an annual review hearing in April 2006, testimony was presented that mother, now seven months pregnant, had been released from jail in late March 2006. She had not, however, participated in any of the services required under the case plan. The caseworker said father had completed his drug assessment and said he had completed drug education classes. Father also stated that he attended counseling at a local center, but with a counselor that the agency no longer recognized as being licensed. Father also claimed to be attending CA, NA, and AA meetings and to have participated in computer and "fatherhood" classes at the Source, a local employment service center. Father also had been living at the same four bedroom residence at 61 City Park, since May 2005. Father visited with the children at the agency and appeared to be bonded with them.
 {¶ 9} The caseworker stated that the agency was considering custody to father, but had some concerns regarding the housing stability, and whether he would remain separated from mother. The agency's concerns regarding mother were that she had completed no services, had not visited the children, and that she and father had many unresolved domestic violence issues, and that her drug use had not been addressed.
 {¶ 10} Father claimed that mother was then in the hospital with medical complications from the pregnancy, but that she had been participating in domestic violence and anger management programs. He stated that the parties did not live together and that he did not want to jeopardize his ability to get custody of the children. The trial court granted LCCS's motion for an extension of temporary custody, to consider custody to father, provided he completed his case plan services. *Page 5 
 {¶ 11} At the time the original complaints were filed, Jere had not yet been born. LCCS filed a third complaint alleging dependency in July 2006, shortly after his birth. On September 19, 2006, the court conducted adjudicatory and disposition hearings regarding the complaint for neglect and dependency regarding the newborn Jere. Mother, who was not present at the hearing, had expressed her desire to the caseworker that father have custody of the children. Apparently mother had arrest warrants issued pertaining to an altercation with father that occurred in July 2006. Mother did not want to come into the agency or the court.
 {¶ 12} The caseworker stated that father's house had burned down, and he had accused mother of starting the fire. At the time of this hearing, father was living with his own mother and attempting to find separate housing. The caseworker also said that father had not made significant progress in participating in case plan services.
 {¶ 13} Father expressed some concern that the child might not be biologically his child, and the agency noted that a paternity test had been scheduled. Father argued that the agency had taken custody of the child immediately after his birth, and he had had no chance to parent, care for, or provide for the child. He also stated that a maternal aunt had said she was willing to take custody of Jere, but she did not attend the hearing. After hearing all the testimony, the court found Jere to be dependent and awarded temporary custody to LCCS. *Page 6 
 {¶ 14} On April 27, 2007, the trial court conducted a hearing on LCCS's motion for permanent custody of all four children.[2] Testimony was also presented that mother had not participated in or completed case plan services. Mother acknowledged to the caseworker that she used drugs throughout her pregnancy and now refused to come in or "drop" for drug screens, stating that she knew she would test "dirty."
 {¶ 15} Two caseworkers then testified as to father's participation. The first, Debra Proe, had been the agency caseworker from May 2005 through September 2006. She reiterated that father had complied with parts of the case plan, but had failed to follow through with recommended treatment and other services. The caseworker stated that although father had acknowledged using crack cocaine, he denied having a substance abuse problem. Between August and December 2005, the caseworker had difficulty contacting father. Proe stated that she called and left messages and sent letters to set up his office visits, but father failed to respond. When he came to the agency in December, father stated he wanted to get custody of his daughters and was going back into services.
 {¶ 16} Although father attended counseling with a counselor who did not satisfy the agency's requirements, Proe said that the agency was going to consider it as an effort to work the case plan. She noted that father was aware at that time also, that the agency expected him to remain separated from mother, because of the domestic violence and drug issues. The caseworker stated that she had requested father to submit to random *Page 7 
drug screens on eight to twelve times, but he did not comply. At his request, when he was in the office, father submitted a drug screen, which came back negative. But, the caseworker explained to him that this test could not count as one of the "random" tests required by the case plan. She also told father that each time he failed to show up for a screen, the failure counted as a "positive" result. She noted that on September 19, 2006, after the staffing, father had "dropped" for a drug screen that showed a positive result. Proe noted that although father had housing from May 2005 to July 2006, a fire had destroyed the home. He had not found another house at the time Proe was assigned to her new position, at the end of September 2006. She had no further contact with father after that time.
 {¶ 17} The second caseworker, Joy Shakur, testified that she had been the caseworker from September 2006 to the time of the hearing. She stated that after father tested positive for cocaine, he was again referred for drug assessment. He complained that the agency would not pay for his assessment, although it had paid for mother's. The caseworker explained that, since father had private insurance, the agency usually did not pay. After father said his insurance would not pay for the assessment, however, she stated that she had gotten him referrals for both the drug diagnostic assessment and domestic violence programs. Father said he wanted to go to a previously used provider, "Harbor," for the diagnostic assessment, and said he would make the calls himself. Father told the caseworker prior to the hearing that day, however, that Harbor had refused to do counseling services for him. *Page 8 
 {¶ 18} Shakur also testified that she had requested father to submit 11 random drug screens from October 2006 to the hearing date. Father had not complied with any of the requests, saying that he could not leave work. The caseworker also stated that although father had apparently again obtained separate housing, mother was again living with him. Shakur testified that this presented a problem because of past and unaddressed domestic violence issues between the parents. She noted that the agency had clearly indicated to father and mother that this would be an impediment to regaining custody of the children. In March 2007, mother had indicated to the caseworker that another domestic violence incident had occurred with father.
 {¶ 19} Finally, Shakur stated that visitation with the children was scheduled separately for mother and father, to avoid any altercations. During his visits, however, father would wander the halls, often meeting with mother out in front of the agency. He would then bring mother into the visit area, without the agency's permission or approval. Agency staff also observed that while he was out talking to mother, he would leave the older children to look after the baby, Jere. On one occasion, but for the intervention of agency staff, the baby would have been injured by rolling off a table. When told that he could not bring mother into his visits, father became confrontational, stating that he wanted the children to see mother. He also saw nothing wrong with leaving the 13 and 14 year old children to supervise, feed, and change the diapers of the baby while he went outside to talk with mother. *Page 9 
 {¶ 20} Shakur testified that, mother had just recently completed a diagnostic assessment and appeared to be reengaging in services at Unison and other substance abuse treatment. Mother's late efforts, in Shakur's opinion, were not enough to justify extending the time period for her to work on regaining custody. The agency's position was that the children needed permanency and that the parents had not completed the required treatments and services within a reasonable time, even with the extensions that had been previously granted by the court.
 {¶ 21} Father then testified that, due to the fire in his other home, he had difficulty, but had finally obtained housing which was suitable for all the children. Father also stated that he was randomly tested for drugs by his employer. He said that he could not take off from work when the caseworkers requested to do the random tests. He acknowledged, however, that he did not comply with the requests, even during the several months over the winter, when he was laid off and collected unemployment. He said the certificates of completion for the programs and counseling he had completed had been destroyed when his house burned down.
 {¶ 22} Father also presented a document, dated February 20, 2007, from his employment which was an order for his work physical. He stated that in order to start work after his winter lay-off, he would have had to pass a physical examination, including having a negative drug screen. Father said he had been working for the Port Authority on the docks for about 19 years. He also said that he earned income of $21,000 for nine months when he worked, and $8,000 from unemployment. *Page 10 
 {¶ 23} Father denied that the caseworker had requested 11 random drug screens. He then stated that when she did make a request, he was unable to contact her. Father also acknowledged that, as a result of the altercation in March 2007, there was a temporary restraining order issued against him, ordering no contact with mother. He also denied ever being asked to sign releases for information regarding any services or treatment he had completed.
 {¶ 24} On rebuttal, Shakur testified that, because father said the certificates had been destroyed, she offered to contact the different providers or counselors to obtain verification that father had completed their programs. Father would not sign releases for this information, insisting that he would contact the providers and obtain new certificates. Father never provided documentation and never signed releases so that the caseworker could follow up and obtain the information.
 {¶ 25} On June 7, 2007, the trial court granted LCCS's motion for permanent custody, finding that neither parent had substantially completed the required components of their case plans. Regarding mother, the court found that she had a substance abuse problem and failed to follow through with the recommended intensive out-patient treatment. She was also incarcerated from October 2005 through March 2006. In June 2006, mother admitted to again using crack cocaine. In March 2007, mother finally followed through with the diagnostic assessment, and was found to be suffering from "depressive and eating disorders as well as marijuana and cocaine dependency." She began services, but only within the two weeks prior to the April 27, 2007 hearing date. *Page 11 
She was referred to Project Genesis, a domestic violence women's group, but stopped attending after one session. She has never established adequate housing, and visited the children only once or twice after she was released from incarceration in March 2006. In July or August 2006, mother told the LCCS caseworker she wanted nothing more to do with the case. Even when attempting to resume visits in January 2007, she failed to follow the agency visitation guidelines.
 {¶ 26} As for father, the court found that although he completed an initial diagnostic assessment and attended a domestic violence program, he did not attend satisfactory individual counseling. The court also found that father had not obtained proper housing until November 2006. The court further found that father was not candid about his past drug use and did not submit to random drug screens as required by the case plan. Although father tested negative in a non-random drug screen on one occasion, on September 19, 2006, pursuant to a court ordered screen, he tested positive for cocaine. The court also found that father's visits with the children were not satisfactory.
 {¶ 27} Appellants now appeal from that judgment, arguing the following sole assignment of error:
 {¶ 28} "The trial court erred in granting permanent custody to Lucas County Children Services Board as Lucas County Children Services Board failed to show by clear and convincing evidence that it is in the best interest of the minor children that permanent custody be awarded to Lucas County Children Services Board and they [sic] *Page 12 
failed to prove by clear and convincing evidence any portion of Ohio Revised Code Section 2151.414."
 {¶ 29} R.C. 2151.414 provides that a parent's rights may not be terminated unless the court finds evidence that (1) the child, "* * * cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent," and (2) that a grant of permanent custody of a child to a children's service agency is in the child's best interests. R.C. 2151.414(B). With respect to the first requirement, R.C. 2151.414(E) sets forth a list of 16 predicate findings. One of those findings must be established prior to a judicial conclusion that a child cannot or should not be placed with the child's parent. R.C. 2151.414(E). If a court determines that one of the predicate findings exist, then the court must enter a finding that the child cannot be placed with either of his or her parents within a reasonable time or should not be placed with either parent. R.C.2151.414(B)(1).
 {¶ 30} The statute also enumerates certain criteria for evaluating whether permanent custody with a children's services agency is in the child's best interests. R.C. 2151.414(D)(1) through (5). All of the court's findings must be supported by clear and convincing evidence. R.C. 2151.414(B); In re William S. (1996), 75 Ohio St.3d 95, 100. The court's findings will not be overturned as against the manifest weight of the evidence if the record contains competent credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established. In re S. (1995), 102 Ohio App.3d 338, 344-345. *Page 13 
 {¶ 31} In determining the best interest of a child, the trial court is required to consider the factors contained in R.C. 2151.414(D). These factors are:
 {¶ 32} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care givers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 33} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 34} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 35} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 36} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 37} In this case, after considering all the evidence presented, the court specifically found as to all four children, that:
 {¶ 38} "Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the *Page 14 
home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." Although not designated as such, this constitutes a finding pursuant to R.C. 2151.414(E)(1). In addition, the court found that both parents were "unwilling to provide food, clothing, shelter, and other basic necessities for the [children] or to prevent the [children] fromsuffering physical, emotional, or sexual abuse or physical, emotional,or mental neglect" (Emphasis added.)
 {¶ 39} This establishes a finding under R.C. 2151.414(E)(14).
 {¶ 40} Our review of the record reveals that the trial court's findings are well-supported by clear and convincing evidence. Mother's and father's unaddressed domestic violence issues resulting in continued altercations, mother's drug use and failure to complete any services or treatment, father's positive drug test and failure to submit to further random screens, and father's failure to recognize the need to supervise and keep his children safe all support the court's finding that the children cannot or should not be placed with the parents within a reasonable time.
 {¶ 41} In this case, we note that the record also supports the court's finding that reasonable case planning and diligent efforts were provided by the agency to assist the parents in remedying the problems that caused the removal of the children. Finally, we note that the evidence presented in the record indicates that the trial court considered the factors in R.C. 2151.414(D), and properly determined that permanent custody was in the best interest of the four children. *Page 15 
 {¶ 42} Therefore, we cannot say that the trial court erred in terminating appellants' parental rights or in awarding permanent custody of the four children to LCCS. Accordingly, appellants' sole assignment of error is not well-taken.
 {¶ 43} The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Arlene Singer, J., William J. Skow, J., Thomas J. Osowik, J. CONCUR.
[1] The biological mother of Sierra and Jerica was also a party to the complaints, but she is not a party to this appeal. Although her parental custody rights were terminated, she only appeared at the initial adjudication hearing on June 16, 2005, and never appeared again during the remainder of the proceedings.
[2] Testimony was presented that the mother of Sierra and Jerica had never participated in case plan services and, after notice, was not in attendance at the proceedings. *Page 1